## THE CHARLES C. LISTER.

(District Court, S. D. New York. December 14, 1909.)

COLLISION (§§ 56, 129, 132*)—EVIDENCE—OVERTAKING VESSEL—SALVAGE.

Collision in Chesapeake Bay between the schooner Charles C. Lister and the hawser of a line of barges in tow of the tug Bohemia by which three of the barges were cut adrift. Proceedings in the United States District Court for the Eastern District of Virginia resulted in a salvage award in favor of a rescuing tug. *Held*, that the barges were duly lighted, and that the schooner was an overtaking vessel and in fault for the collision because of a defective lookout. Also *held* that the Transportation Company and Redman were entitled to recover the amount of salvage awards with costs paid by them and that the latter should recover the value of the broken hawser.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 283; Dec. Dig. §§ 56, 129, 132.*

Overtaking vessels, see note to The Rebecca, 60 C. C. A. 254.]

(Syllabus by the Judge.)

In Admiralty. Actions by the Inland Transportation Company by the Southern Transportation Company and by John C. Redman against the schooner Charles C. Lister. Decree in favor of the Southern Transportation Company and John C. Redman.

Hyland & Zabriskie, for claimant.

James J. Macklin, for Inland Transp. Co.

Horace L. Cheyney, for Southern Transp. Co.

Carver, Wardner & Goodwin and Horace L. Cheyney, for The Carroll.

ADAMS, District Judge. The first of the above entitled actions was a proceeding against the schooner Charles C. Lister, which resulted in a decree of condemnation and sale. The proceeds of the sale are now in the registry of the court. The second action was brought by the Southern Transportation Company, the owner of the barges Roanoke and Nansemond, against the said proceeds to recover the damages caused by the cutting adrift of those barges by the Lister sailing into the hawser of the tow of the Bohemia. The third action was brought by the owner of the barge Carroll, and bailee of her cargo of coal, against the Lister to recover the damages caused by the cutting adrift of the Carroll from the said tow of the tug Bohemia in the same accident; also the value of the broken hawser. All of these accidents happened in the lower Chesapeake Bay, about 11:30 p. m. on the 26th of January, 1908. The first action, the Inland Transportation Company, resulted in a sale of the schooner as above stated. When the second action came to trial, the owner of the Carroll intervened and the trial proceeded on the merits of the action.

The libel and petition of intervention allege that the Bohemia was proceeding down the Chesapeake Bay, bound into Hampton Roads, with the barges Albemarle, Carroll, Nansemond, Roanoke and Mascot in tow on hawsers, tandem; that about 11:30 p. m. the tow had reached a point a little to the south of Thimble Light Ship, and the Lister came

---

up astern; that notwithstanding the tug and barges were properly lighted, the schooner came in contact with and parted the hawser between the barges Albemarle and Carroll, causing the Carroll, Roanoke, Nansemond and Mascot to go adrift; that thereafter the Carroll, the Roanoke and the Nansemond were anchored and early the following morning were taken in tow by the tug Dauntless and towed to Lamberts Point; that subsequently libels were filed in the District Court of the United States for the Eastern District of Virginia by the master of the Dauntless against the Carroll, the Roanoke and the Nansemond and their cargoes of coal and freight, to recover salvage compensation for the services rendered; that the collision between the schooner and the hawser was due to the negligence of the Lister: (1) in not keeping a proper lookout, (2) in not avoiding said tow, coming up astern of same, (3) that the navigation of the schooner was in charge of incompetent persons. At the time of filing this libel, the said suit in the Eastern District of Virginia had not been tried but has been since. The decree against the barges has been affirmed on appeal and has been paid, viz.: $2,024.74 for salvage of the said barges Roanoke and Nansemond, and $468 for salvage of the barge Carroll with $329.64 and $259.63 costs. The libel also alleges that the schooner has heretofore been sold by the marshal of this court for the sum of $4,500, and that the proceeds of the sale, or a bond in lieu thereof, are in the registry of the court. A recovery is also sought in the latter action of the sum of $34, the alleged value of the hawser destroyed, which was the property of Redman, the owner of the Carroll.

The answer, after some admissions and denials, alleges:

"That on the 26th day of January, 1908, the said schooner Charles C. Lister was then proceeding up the coast on her way to New York, N. Y. That shortly after 9:30 o'clock P. M. the weather was so rough and the seas so high outside that it was necessary to go into Hampton Roads for harbor, and accordingly she rounded Cape Henry at about that time; about 11:30 P. M. she was proceeding on a course west-north-west going into Hampton Roads. At said hour when about a mile or two from Thimble Light House she discovered a white light on a vessel which bore about two points on her starboard bow and about a mile off. That for several hours before the collision hereinafter referred to said tug Bohemia and her tow of five boats, together being from ⅔ to ¾ of a mile in length had been lying practically still across the course on which the said schooner Charles C. Lister was sailing, with the tug Bohemia and a part of her tow on the port side of the said schooner's course, exhibiting no lights at all to the approaching schooner until the latter vessel was only a short distance away when the tug Bohemia apparently circled around so as to show her red light, then both her red and green lights, and then shutting out her green light and showing only a red light on the schooner's port bow, all of which lights were so exhibited and visible for only a few moments before the collision, and not in time for the schooner to do anything to avoid such collision, whilst the latter vessel held her course. At about that time, which was as above stated 11:30 P. M., the schooner ran across the hawser between the first and second barges in tow of said tug, cutting the hawser in two, but doing no other damage.

That from half an hour to an hour and a half before the schooner Charles C. Lister appeared upon the scene the barge Mascot had foundered and sunk and become lost and not by reason of the cutting of the tow line between the first and second barges of the said tug by the schooner Charles C. Lister. That the tug Bohemia had come down from Baltimore, Md., as claimant is informed and believes and had reached a point abreast of said Thimble Shoal Light House at about 6 o'clock P. M. or a little latter in the evening of the said 26th

day of January, 1908. That owing to the lack of sufficient power in the tug. and to the then boisterous condition of wind and weather the said tug was unable to manage her tow but would forge ahead a little and then the tow would drift her back so that for several hours before the alleged collision the said tug had made practically no headway at all. That at the time of the collision the wind and seas had moderated somewhat but still the tow of the tug Bohemia was close to the light house and liable to drift against the light house there. That as claimant is also informed and believes the captain of the Bohemia ran across the bows of the schooner Charles C. Lister and then circled around in an endeavor to pull his tow away and off from the shoals at the said light house.

XI. That the schooner Charles C. Lister held her course, had proper and sufficient lookouts on deck. properly stationed and attentive to their duties and had. her regulation lights all properly set and burning. That as claimant is informed and believes, the vessels in tow of the tug Bohemia did not have their regulation lights properly set and burning, and the last barge in said tow did not show a flare-up light or any other light as by law she was bound to do, and the tug Bohemia did not have competent and sufficient lookouts properly stationed and attending to their duties, nor did she give any signals or warnings of any kind to the schooner to make known the presence of herself and tow across the course of the schooner which was the regular channel course up from the Capes.

XII. That the steamtug Bohemia did not have sufficient power to handle the tow she had in charge at that time and that the said steamtug Bohemia ran across the course of the schooner Charles C. Lister as aforesaid, instead of keeping out of her way. as by the laws and rules of navigation (being a steam vessel) she was obliged to do.

XIII. That the tow of the steamtug Bohemia was so long and unwieldy as to be a menace to navigation and that the steamtug Bohemia blew no whistles to the schooner Charles C. Lister at any time before the collision of the latter vessel with the said tow line.

XIV. That the said schooner Charles C. Lister sailed up Hampton Roads as aforesaid on the usual course which was west-north-west, the wind at the time being west-south-west and the tide ebb."

The testimony shows that the Mascot broke adrift some little time before the collision and her claim is out of the case. The controversy now is with respect to the charges of fault against the Lister for cutting the barges Carroll, Roanoke and Nansemond adrift, and involves the question of lights on the tug and the barges, and of the care exhibited by the Lister, she being an overtaking vessel.

It appears that the towing line between the tug and the Albemarle was about 100 fathoms in length and the lines between the barges were about 75 fathoms in length. The whole tow, including the tug and barges, was, according to the master of the tug, about ¾ of a mile.

The Inspectors' provisions with respect to lights to be carried by barges and canal boats in tow of steam vessels on the waters in question, are:

"On the inland rivers, bays, sounds, and harbors of the United States— except on the waters of the Hudson River and its tributaries from Troy to Sandy Hook, the waters of the East River and Long Island Sound, and the waters entering thereon, and to the Atlantic Ocean, to and including Narragansett Bay, R. I., and tributaries, and Lake Champlain—barges and canal boats towing astern of steam vessels, when towing singly, or what is known as tandem towing, shall each carry a green light on the starboard side and a red light on the port side."

These are the only lights required to be carried on barges towed in the Chesapeake Bay. The regulations with respect to screening, etc., are, viz.:

"The colored side lights referred to in these rules for barges and canal boats in tow shall be fitted with inboard screens, so as to prevent them from being seen across the bow, and of such a character as to be visible on a dark night, with a clear atmosphere, at a distance of at least 2 miles, and so constructed as to show a uniform and unbroken light over an arc of the horizon of 10 points of the compass, and so fixed as to throw the light from right ahead to 2 points abaft the beam on either side. The minimum size of glass globes shall not be less than 6 inches in diameter and 5 inches high in the clear."

The rules further provide:

"Any barge or canal boat in tow of a steam vessel, when the last boat of a tow, and not required by these rules to carry a light on the stern, on being overtaken by another vessel, shall show from her stern to such last-mentioned vessel a flare-up light; or, in lieu thereof, a white light fixed and carried in a lantern, which shall be so constructed, fitted, and screened that it shall throw an unbroken light over an arc of the horizon of 12 points of the compass, viz., for 6 points from right aft on each side of the vessel, so as to be visible at a distance of at least 1 mile.

Provided. That nothing in these rules shall be construed as compelling barges or canal boats in tow of steam vessels, passing through any waters en route or directly to or from a port where lights for barges or canal boats are different from those of the waters whereon such vessels are usually employed, to change their lights from those required on the waters from which their trip begins or terminates; but should such vessels engage in local employment on waters requiring different lights from those where they are customarily employed, they shall comply with the local rules where employed."

The provision for vessels towed tandem on the waters in this vicinity carrying "a white light on the bow and a white light on the stern" did not prevail in the Chesapeake Bay.

The provisions covering a towing vessel were:

"Art. 3. A steam-vessel when towing another vessel shall, in addition to her side-lights, carry two bright white lights in a vertical line one over the other, not less than three feet apart, and when towing more than one vessel shall carry an additional bright white light three feet above or below such lights, if the length of the tow measuring from the stern of the towing vessel to the stern of the last vessel towed exceeds six hundred feet. Each of these lights shall be of the same construction and character, and shall be carried in the same position as the white light mentioned in article two (a) or the after range light mentioned in article two (f).

Such steam-vessel may carry a white light abaft the funnel or aftermast for the vessel towed to steer by, but such light shall not be visible forward of the beam." U. S. Comp. St. 1901, p. 2864.

It appears that the Bohemia was exhibiting the regulation side lights. It is claimed by the libellant that she was exhibiting three towing lights, also two white lights back of the house which showed aft. There has been some criticism of the towing lights in that they were not in conformity with the regulations requiring them to be "not less than 3 feet apart." According to the testimony of the chief engineer of the Bohemia the distance between them was only "a foot or so." The witnesses for the schooner say there were only two visible, although they were looking for them carefully. The master, however, said that the lights were properly displayed, i. e., there were three of them and there were 3 feet between them. These lights as shown, assuming the three were visible, as I think they were, would indicate that the tug had a tow astern, exceeding 600 feet in length. It seems that the Bohemia was 95 feet long, the hawser to the Albe-

marle 600 feet long, while she was 170 feet long. The hawser between the Carroll and the Albemarle was about 450 feet, so that assuming the hawser was struck one-third of its length between the barges from the Carroll, that would be, say 1070 feet from the stern of the tug. The towing lights on the tug advised the schooner that there was a tow of at least 1000 feet behind her.

The course of the tug, after turning Thimble Shoal about 6 o'clock, was west by south. The course of the Lister when coming in, was west-north-west, a difference of three points. The latter, therefore, could not see the colored lights of the tug or of the barges and she was dependent for information as to the tow upon the towing lights exhibited by the tug and by those on the respective boats of the tow.

The master of the Albemarle, the first barge in the tow, said that in addition to his side lights, he showed—

"* * * two lights back on the stern at the same time which we wanted for the barge astern of us in distress. * * * Q. Did you see those lights after the Lister struck the tow line? A. Yes, sir."

The master of the Carroll, the second in the tow, said his barge carried, in addition to side lights, a bright light 10 to 11 feet above the deck, not visible from forward.

The deck hand of the Carroll, standing in the pilot house, saw the Lister's green light as she passed ahead and saw her luff to avoid striking the Carroll. He said that his boat was exhibiting two masthead lights to signal to the tug, and a bright light astern "right back of the pilot house" which was used that night for anchoring; he also said they had two lights on the pole before he saw the Lister, to signal to the tug at the time the Mascot was in trouble, but they were taken down before the Lister came up. He also said the lights were taken down at the time they anchored, which was after the Lister passed.

The master of the Roanoke, the rear barge, said he had in addition to his side lights, a light aft of the cabin, fastened in a hook on the cabin about 6½ feet above the deck. The deck hand of the Roanoke testified to practically the same.

There were no witnesses from the Nansemond, but the foregoing practically establishes that some of the stern lights of the barges were displayed and should have been seen by the Lister but they were not seen and the Lister kept on her course across the tow and collided with the towing line between the first two barges. There is no contradictory testimony.

The testimony shows that the Bohemia and her tow at the time of the collision were either standing still in the water or going back. They had progressed beyond the point of striking and retrograded from the force of the wind and tide. It is not clear whether or not the tow was still going astern when the Lister approached, but it does appear that it was at least not making any progress. This was doubtless due to a strong wind, adverse to proceeding, but I do not see that the tow should suffer from this fact, nor from the fact, if it be such, that the tow was in the southern instead of the northern side of the channel. If it was on the wrong side—I am rather inclined to believe the

contrary—it was due to the storm and the tow is not responsible for its effects.

I think the collision with the hawser was primarily due to the Lister's lack of a proper lookout. It was said in her behalf, that she had one properly stationed, but if so, he did not see and report the lights exhibited by the tow, and the accident should be attributed to that cause.

The claim of the schooner that the Bohemia was heading toward her seems incredible and should not be sustained. Perhaps she was not directly ahead of her tow, but her general direction was toward her destination.

It follows from what has been said that the libellant should succeed. It is urged in this connection that a decree should not cover the costs of the salvage proceedings, citing Greenwood v. The Fletcher (D. C.) 42 Fed. 504, which relies for authority upon The Brig Homely, 8 Ben. 495, Fed. Cas. No. 6,661, and The Tug C. F. Ackerman, 8 Ben. 496, Fed. Cas. No. 2,562. It does not appear from the reported cases that such a decision was made. Judge Brown seemed to think so, however, and he based his decision thereon, saying: "I am not at liberty to depart from that adjudication." I am unable to see any reason why if resort to the amount awarded in the case was proper, the taxable costs of obtaining the decree should not be allowed. I therefore hold that this point is not well taken.

There will be a decree for the Southern Transportation Company and John C. Redman for the amount of the salvage awards, with interest. There will also be a decree in favor of Redman for the value of the broken hawser, said to have been $34. If there is any dispute about the latter item, a reference will be had to ascertain the value.